ISAAC B. BRISTOL vs. THE OUSATONIC WATER COMPANY.

A company was chartered by the legislature, in the year 1864, with power to build and maintain a dam across a river, at a point where the tide ebbed and flowed; the charter providing that the company should construct a fishway in the dam sufficient for the free passage of fish up the stream, and if it should prove inadequate the company to pay all damages the owners of fisheries above might sustain by reason of the obstruction, with a provision for the assessment of the damages, where not agreed upon, by a committee appointed by the court upon the application of the company.   The company built the dam in 1870, and constructed in it a fishway according to a plan approved by the fish commissioners of the state, which was accepted by them in 1871.   It proved however to be wholly inadequate, although alterations were afterwards made in it by direction of the commissioners, and in 1873 an owner of a fishery above the dam brought an action on the case against the company for damages for the obstruction.   A statute passed in 1871 provided for the appointment of a committee by the court for the assessment of such damages upon the application of the owner of a fishery.   Held—

1.   That the dam having been erected under authority of the legislature, the defendants could not be regarded as wrongfully maintaining it.

2.   That, the fishway proving inadequate, the defendants were to be allowed a reasonable time to construct another.

3.   That if they failed to do so within a reasonable time, the plaintiff would then become entitled to damages.

4.   But that, the charter having provided a mode of assessing these damages which was made available for the plaintiff by the act of 1871, he was precluded from any other remedy.

5.   Whether, if the defendants should neglect to construct a sufficient fishway within a reasonable time, and should also neglect to procure, within a reasonable time thereafter, an assessment of the plaintiff's damages in the mode provided in the charter, he might not then resort to his common law remedy: Quære.

A summary of the legislation of the state with regard to fisheries.   See note, p. 410.

TRESPASS ON THE CASE, for damage to a shad fishery of the plaintiff, by a dam erected by the defendants; brought to the District Court of Litchfield County. The defendants pleaded the general issue, with notice that the dam was built under authority of a resolution of the General Assembly, the same matter being also pleaded specially, and the plaintiff traversing the special pleas. The writ was dated August 13th, 1873. The court found the following facts.

The fishery described in the declaration, with the land connected with it, is situated in and upon the Housatonic river; in part within the town of Bridgewater in Litchfield County and in part within the town of Brookfield in Fairfield County, and has been used exclusively as a shad fishery, by the plaintiff and his grantors, for about fifty years preceding the commencement of the present suit, and was owned in common by the plaintiff and many others, the plaintiff then owning, and for more than twenty-five years past having owned, occupied and possessed one-twentieth of the same as a shad fishery.

During all this time the plaintiff and the other proprietors of the land and fishery, during the season of each year when they might by law catch shad in the river, had been accustomed to catch them therein at the fishery by means of nets, seines and other suitable instruments, and the plaintiff had been assessed and taxed for his interest in the property as a fishery.

Prior to the erection of the dam across the river as hereinafter mentioned, shad had in considerable quantities annually passed from the sea up the river to the fishery, and for twenty-five years next before the erection of the dam were taken in seines and nets by the plaintiff at the fishery.

During all this time the plaintiff had enjoyed the free and unobstructed use of the waters of the river from the sea, below the dam, to the fishery above, for the passage of shad to the same, but only by virtue of his right and ownership, as derived from the foregoing facts; and whatever exclusive rights and interests the plaintiff has to catch shad at the fishery and to the exclusive use of the fishery, are to be found in the foregoing facts.

The defendants are a corporation duly organized under a charter granted by the General Assembly of this state in 1864. The provisions of the charter important to the present case are as follows:

"SEC. 8. Said company shall have full power, and they are hereby authorized, to erect and maintain a dam, not exceeding twenty-two feet in height, across the Ousatonic river, at some point in said river between the bridge of the Derby Bridge & Ferry Company and the locality known as the Leavenworth Bridge place; and to construct on either or both sides of said river all such canals, aqueducts, culverts, and waste weirs as may be necessary or convenient to enable said corporation to improve and make available the water power afforded by said dam; provided however, that said corporation shall construct one of said canals conducting the water from above or at said dam, to some suitable point in said river below said dam, of sufficient width and depth to admit the passage through the same of vessels or scows of the dimensions of those ordinarily used in navigating said river above the locality of said dam;    *    *    *    and provided also that said corporation shall construct and maintain at said dam, as part thereof, suitable and proper fishways to admit the free passage of fish up and down said river above said dam, and to be kept open at such seasons as are necessary and usual for the passage of fish; and if said fishways shall prove inadequate to admit the free passage of shad up and down said river above said dam, said company shall be holden to pay all damages the owners of fisheries above said dam shall sustain by reason of the erection of said dam; and said damages shall be ascertained and fixed in the manner provided in the eleventh section of this act."

"SEC. 11. It shall be lawful for said company to enter upon and use all such lands and real estate as may be necessary for them to enter upon or use in the erection of said dam and in the setting back of water caused thereby, and in the construction and use of the canals, aqueducts, culverts, waste weirs, locks and weirs connected therewith, and in the alteration of the course of roads and highways; and said company

shall be holden to pay all damages that may arise to any person or persons; and if the person or persons to whom damage may so arise and said company cannot agree as to the amount of such damage, it shall be the duty of said company to apply to the Superior Court of the county in which the real estate or other property damaged may be situated, and to cause notice to be given to the adverse party of such application; and thereupon said Superior Court shall appoint three disinterested and judicious freeholders to assess the amount of such damages, and said freeholders after being sworn shall give notice to the parties of the time and place of their meeting on the business of their said appointment, at which time and place they shall proceed to hear the parties and inquire into the extent of the damages, and shall assess just damages to the person or persons whose real estate or other property has been taken or injured; which assessment shall be in writing, under the hands of said freeholders, and the same shall be returned to the clerk of said Superior Court, who shall record it; and said real estate or other property which is the subject of such assessment shall not be taken or used by said company until the damages assessed shall have been paid or secured to be paid to the satisfaction of the person or persons entitled to receive the same, or deposited with the treasurer of the county within which such real estate or other property is situated."

In the year 1870 the defendants erected the dam authorized by their charter across said river on land belonging to them, partly in the town of Derby and partly in the town of Huntington, at a point about twenty-five miles below the plaintiff's fishery. The dam is built within the local limits specified in the charter for the same, and does not exceed twenty-two feet in height, and is at a point where the tide ebbs and flows, though it does not ebb and flow very much above it; and in building the dam, and the fishways hereinafter mentioned, the defendants have fully complied with the requirements of their charter in regard thereto.

When the defendants built the dam they constructed in it a covered fishway, on the west part of it, extending from the

water of the river below, up the river and through the structure of the dam to the water of the river above, being two hundred feet in length, eight feet in width, and four in height. The fishway was built on a plan approved by the fish commissioners of the state, and after it was finished it was duly approved and accepted by the commissioners after an examination by them. It was finished and opened for use about the first of April, 1871, and has been kept open ever since, having been slightly altered by direction of the commissioners, and to their acceptance.

The fishway has proved however wholly inadequate and insufficient as a passage for shad from the water of the river below to that above, and has never afforded any passage for them, so that by reason of the dam no shad have passed up the river to the fishery or to any point above the dam since its erection.

The dam was erected mainly to improve the water-power of the river; but the improvement of its navigation by means of locks and canals on either side of the river, so as to admit of the use by the defendants of scows and other flat-bottomed boats above the dam, was also to some extent an object in erecting it. Both of these objects have been greatly promoted by the dam, and could not have been otherwise accomplished.

No damage in the premises has been paid to the plaintiff by the defendants, nor have the parties sought in any way to adjust such damage except by the present suit.

The amount of the plaintiff's damages, if he should be entitled to recover any, were assessed at $80.

A statute passed in 1871 provided for the same mode of assessing the damages of the owners of fisheries upon the river above the dam of the defendants, by reason of the obstruction of the dam, that is provided by the defendants' charter, with a provision that the court should appoint the committee to assess the damages upon the application of any owner of a fishery claimed to have been damaged. The charter had provided only for an application to the court by the defendants themselves in such a case.

Upon these facts the case was reserved for the advice of this court.

*L. D. Brewster* and *McMahon*, with whom was *Turrill*, for the plaintiff.

1. At common law the owner of a portion of a non-navigable stream has the sole right of fishery therein, and can sue for injuries caused to his fishery by obstructing the passage of fish thereto. 1 Swift's System, 343 ; 1 Swift's Digest, 114 ; Washburn on Easements, 411 ; Angell on Watercourses, §§ 61, 85, and note. For more than a hundred years it was an indictable offense to obstruct the passage of fish in the Housatonic and other rivers in this state, and our statutes and all our decisions in reference to riparian owners, imply and assume the common law right to sue for their obstruction. Statutes, ed. of 1808, p. 330. As early as 1647 a law was made against the obstruction of the passage of fish in rivers. N. Hav. Colonial Records, 311.

2. The defendants' charter is no protection against the plaintiff's action. 1st. They have not followed its provisions, and had the damage to fisheries obstructed by them appraised, as it was their duty to do. Charter, sec. 11. They have disobeyed its express requirements, and their obstruction is a tort-feasance. 2d. No charter can authorize the infliction of injuries of this kind without compensation. *Hooker* v. *N. Haven & Northampton Co.*, 14 Conn., 146 ; *Same* v. *Same*, 15 id., 312 ; *Denslow* v. *N. Haven & Northampton Co.*, 16 id., 98 ; *Nicholson* v. *N. York & N. Haven R. R. Co.*, 22 id., 74 ; *Eaton* v. *Boston, Concord & Montreal R. R. Co.*, 51 N. Hamp., 504 ; *Lee* v. *Pembroke Iron Co.*, 57 Maine, 481.

3. The remedy provided for the fishery owners by the act of 1871, is permissive and cumulative, and not exclusive of the common law remedy. The common law remedy was the only one existing 'for a year after the erection of the defendants' dam, for their charter authorized only the company to call out the appraisers, and made it their duty to do so. That common law right has been taken away neither directly nor by implication. This act is in no sense an amendment to the defendants' charter. It applies to other dams as well as theirs, and to other obstructions as well as dams. Not having pursued the requirements of their charter, and had the dam-

ages to the fisheries appraised under their charter, they stand as any other tort-feasor who should unlawfully build a bush seine or other obstruction across the stream, and cause such damage.. Not being part of any general flowage act or special charter, and merely providing and allowing a new remedy, where the common law had immemorially provided an ampler one, the statute comes within the general rule so well settled as to be elementary law, that "affirmative words do not take away the common law remedy." The one illustration in Blackstone, and several in Sedgwick are just in point. 1 Black. Com., 89; Sedgwick on Statutory Law, 38, 95, 402, 406; Dwarris on Statutes, 74, 319, 220; *Case* v. *Humphrey*, 6 Conn., 140; *Hartford & N. Haven R. R. Co.* v. *Kennedy*, 12 id., 525; *Ward* v. *Griswoldville Manf. Co.*, 16 id., 596; *Mann* v. *Cooke*, 20 id., 178; *Melody* v. *Reab*, 4 Mass., 471, 3; *Farmers' Turnpike* v. *Coventry*, 10 Johns., 389; *Barden* v. *Crocker*, 10 Pick., 383; *Crittenden* v. *Wilson*, 5 Cowen, 165; *Selden* v. *Del. & Hudson Canal Co.*, 24 Barb., 362; *Fletcher* v. *State Capital Bank*, 37 N. Hamp., 369; *Adams* v. *Richardson*, 43 id., 212; *State* v. *Wilson*, id., 415; *Stokes* v. *Sanborn*, 45 id., 274; *Parks* v. *Crockett*, 61 Maine, 489, 494; *Proprietors of Fryeburg Canal* v. *Fry*, 5 id., 38. The familiar exceptions to this rule which change the permissive "may" to the imperative "must," or exclusive "may only," are of two classes. First, where the party ought in duty to do what the statute says he "may do," as being for the public benefit or public justice, or because an injury results to third parties if he does not do it. And second, where, as in railway laws and flowage acts, a full, adequate and mutual remedy is provided in statutes embracing the whole subject matter, and conferring new powers and rights. In this case the remedy is part of the whole plan and comes in as one of the conditions, benefits or necessities of the grant. The law in its nature would be incomplete if it did not cover the whole ground. But under the statute of 1871, in the first place, there is surely no obligation imposed on the owners of fisheries to sue anybody, and, in the next place, the act does not pretend to deal with charters or flowage rights, confers no new powers or privileges, and au-

thorizes suits not against chartered proprietors, or owners of lawful dams only, but against "any person, persons or corporations" who obstruct the passage of shad, however wrongfully. The remedy must, of course, apply with equal exclusiveness to all or to none. In New Hampshire, under a general flowage act, in *Ash* v. *Cummings*, 50 N. Hamp., 591, the language of a statute giving to either party permission to apply to the Supreme Court to have three appraisers appointed, the words being "either party may apply," was held not to take away the common law remedy. The head note of the case is as follows: "The act of 1868, known as the flowage act, although it provides for an assessment of the land owner's damages, does not take away his right to maintain an action of tort at common law to recover damages for such flowage until there has been an assessment of damages under the act, and a judgment rendered for the damages so assessed, and the amount of such judgment has been paid or tendered to the person aggrieved or damaged by the flowing of his land." The statute of 1871 has none of the careful safe-guards which make our flowage acts constitutional, preserving the trial by jury, guaranteeing full compensation, insuring payment, and providing for rehearings. Another familiar principle regarding exclusive statutory remedies is that the new remedy, to be exclusive, must be certain and not doubtful. Now the act in question in terms applies to a right in a particular county and to fisheries where the owners join in the petition. In this case a part-owner sues, and the fishery lies in two counties, and the district court, created in 1872, would seem to obtain jurisdiction by the express language of the act of organization. To take away a clear, full common law remedy by construction and leave but a limited and doubtful remedy in its place, would introduce a theory of interpretation as novel in principle as it would be unjust in its application.

*D. Torrance,* with whom was *W. B. Wooster,* contra.*

---

* The points made by the counsel for the defendants are not given, as they are sufficiently stated by the court in its opinion, so far as they are involved in the decision. There was however in their brief a summary of the legislation of

PARK, C. J.   We do not deem it necessary to determine whether a party is entitled by the common law to have the waters of a river connected with the ocean kept free of obstructions from its mouth to its source, so that the fish known as shad may have a free and uninterrupted passage to his fish-

the state with regard to fisheries, as well as a collection of authorities on the subject of the rights of fishery in riparian proprietors, which, though not important to the case in the view taken of it by the court, may be valuable to the profession for reference.   This part of their brief is therefore given.

From the earliest settlement of the state the legislature has regulated and controlled the right to fish in this and other rivers of the state, as seemed best for the public good, and has always treated the fisheries as a great *public interest.* A glance at the course of legislation on this subject will fully bear out this statement.

In the compilation of laws for the year 1784, page 78, the time for fishing in the Ousatonic river is regulated under heavy penalties.   It is recited therein that the interruption of the course of fish by the daily drawing of nets is a great *public nuisance,* and directs informing officers to prosecute for infringement of the law.

In 1796 it was provided that not more than one seine should be drawn at any fishing place on Ousatonic river at any one time under a penalty.

In 1798 all persons were forbidden to draw any seine or other fish-craft in that river, north of a point in the town of Stratford, except between sun-rise on Monday and sun-rise on Saturday of each week in April, May and June, under a penalty.   And the times of fishing in the river have been altered and modified at pleasure.

In 1828 the use of any seine in the river over thirty rods in length was prohibited under a penalty.

In 1866 the setting or fastening of any seine or other fish-craft in the river below Gaylord's bridge, between the first days of April and July, is prohibited under a penalty of fifty dollars.

In 1874 the legislature prescribed the size of the mesh for the seines to be used in the river, and the seine was to be inspected by a public officer before it could be used.

The taking of salmon is wholly prohibited in all rivers till 1880.

Scarcely a year has passed that the legislature has not interfered with the right of fishing in this river.

The same is true of the other rivers and streams in the state above tide water and within it.

In 1824 power was given to each town to make such by-laws as it should deem best for the regulation of the fisheries in the rivers and streams within its limits.

In 1870 all persons were prohibited from taking trout or pickerel or black bass, save with a hook and line, and within the time specified in the act.

In 1874 fishing in Mill river and its tributaries, (small streams or brooks in Fairfield County,) is utterly prohibited for three years.

In 1870 the taking of shad or salmon in the rivers Shetucket, Quinnebaug and Farmington, was utterly prohibited for five years.

ing ground ; for however the common law may be in this respect, we are satisfied that the plaintiff cannot maintain this action against the defendants for any injury he may have sustained to his fishery, by reason of the dam erected and maintained by them.

Fish commissioners have been appointed, and at great annual expense; this state, acting in connection with other states, is using every effort to promote this as a great public interest.

The fish commissioners are authorized to take fish when and where they please, to promote the objects for which they are appointed.

Upon a careful survey of our legislation upon this matter, it will fully appear that the fisheries in all waters have ever been regarded as of great public interest, to be regulated, prohibited and controlled as the state should see fit. The possession of such powers over the subject would seem to be wholly inconsistent with the rights claimed to exist in a riparian proprietor.

It is believed that no case can be found in this country where a right like the one claimed in behalf of this plaintiff has been sustained. So far as we have searched, it is without a precedent.

Our own courts, while fully recognizing the rights of riparian proprietors and protecting them in such rights, have never recognized the right here claimed as one of such rights. *Lay* v. *King*, 5 Day, 76; *Chalker* v. *Dickinson*, 1 Conn., 382; *Adams* v. *Pease*, 2 id., 483; *East Haven* v. *Hemingway*, 7 id., 186; *Hollister* v. *Union Co.*, 9 id., 445; *Stannard* v. *Hubbard*, 34 id., 375. In Pennsylvania and North Carolina the courts have repudiated the common law doctrine, that the riparian proprietor above tide water owns to the center of the stream, as being inapplicable to their condition and circumstances. *Carson* v. *Blazer*, 2 Binn., 475; *Collins* v. *Benbury*, 3 Ired. Law, 277. In the well-considered case of *Shrunk* v. *Schuylkill Nav. Co* , 14 Serg. & R., 71, decided in 1826, after *Adams* v. *Pease* in this state, the court decide that the riparian proprietors on the Schuylkill had no such right as is here claimed.

In most of the states the common law rule has prevailed as to the ownership of the soil in rivers above tide water, but such right as is here claimed is nowhere recognized or hinted at.

In the case of *Vinton* v. *Welsh*, 9 Pick., 87, the court say that the colonial and provincial legislatures have always exercised the power to regulate the fisheries, and that the owners of several fisheries and of dams across rivers, hold their property subject to such restrictions and regulations as may from time to time be adopted.

In *Commonwealth* v. *Chapin*, 5 Pick., 199, the court decides, among other things, that in non-navigable rivers the riparian proprietor has the exclusive right to fish except so far as qualified by legislative provision; that the property of such proprietors is qualified by the common law of Massachusetts by custom and by legislation; that to obstruct such rivers by a dam was no nuisance at common law in that state, and that there was no remedy for such act save that provided by statute.

In the ably considered case of *Commonwealth* v. *Essex Company*, in 13 Gray,

This action is an action at common law for a tort. The plaintiff in his declaration alleges, as he must have done in order to maintain the action, that the defendants wrongfully erected and maintained a dam across the Housatonic river. This allegation is an allegation of substance. It must be proved upon the trial, as well as set forth in the declaration. Suppose the declaration had declared, in accordance with the facts of the case, that the defendants had erected the dam under a resolution of the legislature, fully authorizing them to do so, so that whatever had been done by them had been done according to law, would the declaration have been regarded as sufficient upon demurrer? In order to render the erection of the dam by the defendants actionable at common law the dam must be a nuisance to the plaintiff, and liable to be abated as such by a court of equity, after the plaintiff had established his right to its discontinuance in an action at law. How could this be done in the present case? No claim is made that the defendants' charter does not fully authorize them to do whatever has been done by them. No

239, the court say that the right to have migratory fish pass up the rivers and streams to the head waters thereof is a great public right, and is subject to regulation by the legislature. In the recent case of *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.*, 104 Mass., 450, this doctrine is very strongly re-asserted.

In the case of *Holyoke Water Power Co.* v. *Lyman*, 15 Wall., 500, the court say that it is settled law in Massachusetts, that the right of fishing in such rivers as the Connecticut and Merrimac, even above the point where they are navigable for boats or rafts, is a public right. This case, decided in 1872, contains an able review of the legislation of Massachusetts on this subject.

The law of Maine is substantially the same as that of Massachusetts. In *Cottrill* v. *Myrick*, 12 Maine, 222, it was decided that the riparian proprietor held his right to fish subject to public control; and the court say that any riparian proprietor may erect a dam upon his own land across a non-navigable stream without providing a passage way for fish so long as he violates no existing law, but subject to the right of the legislature to interpose at any time; that no individual can prescribe for such a right, but that it belongs to the public. In this case it appeared that the exclusive right to fish had been given to the towns of Newcastle and Nobleboro', although the waters were not navigable, and the fisheries private property. See also the cases of *Lunt* v. *Hunter*, 16 Maine, 9 ; *Peables* v. *Hannaford*, 18 id., 106. In New York the same law prevails. *People* v, *Platt*, 17 Johns., 195 ; *Hooker* v. *Cummings*, 20 id., 96 ; *People* v. *Canal Appraisers*, 33 N. York, 461. It seems clear that by custom, by legislation, and by judicial decision, the right claimed here by the plaintiff does not exist.

claim is made that the charter is unconstitutional and therefore void; but on the contrary it seems conceded in the argument that the legislature had the power to authorize the erection of the dam in tide-water, in order that the water power and navigation of the river might be improved. How then can this action be sustained? It is absurd to say that the defendants were justified in erecting and maintaining the dam, and still are liable in damages for having erected and maintained it. They could only be liable in damages in any event, if they had proceeded without authority from the legislature; of what avail then is the act of incorporation if still they continue liable? We think it is clear that this action cannot be maintained so long as the defendants' charter is of any validity.

The plaintiff treats the case as if the charter had required the defendants to procure an assessment of his damage in the mode provided for other cases and pay the same before obstructing the river, and, failing to do so, the charter afforded them no protection so far as the plaintiff is concerned. But there is no foundation for this claim. The charter expressly authorized the defendants to erect the dam without paying damages to the plaintiff. It was supposed that the plaintiff would receive no damage to his fishery, the charter providing for fish-ways to be constructed by the defendants in the dam, and it is only in the event that the fish-ways shall prove inadequate to the free passage of shad up and down the river that any damage is provided for the plaintiff. The defendants complied with their charter in this particular, and put in a fish-way at great expense, and but two years had elapsed previously to the bringing of this suit, in which its practical operation could be tested, and the fact ascertained whether it would be adequate to the purpose. The fish-way has since been altered to some extent by the direction of the fish commissioners, and it would seem that the expectation of yet making it successful has not been abandoned; at all events there is no finding to that effect. The defendants' charter clearly implies that the owner of a fishery is not to be entitled to damages so long as it may reasonably be expected that

a fish-way will be constructed by them within a reasonable time that shall be adequate to the free passage of shad. When that expectation is no longer justified, and a finding shall be made to that effect, we will then consider whether the plaintiff has any other mode of redress for the injury he may have sustained to his fishery besides the one provided in the defendants' charter, taken in connection with the statute of 1871 on the same subject.

In conclusion, we think the plaintiff's action cannot be sustained in the present state of the case, even if the common law had established the right of the owner of a fishery upon the river to have its waters kept free and unobstructed for the passage of shad up and down the stream. That right has been taken away or suspended by the defendants' charter, if it ever existed; and will so remain until the time when there shall be no longer any reasonable expectation of an adequate fish-way being made in the dam, and within a reasonable time under all the circumstances, and a reasonable opportunity afterward shall have been afforded the defendants to assess and pay the plaintiff's damage in accordance with the provisions of their charter.

We advise judgment for the defendants.

In this opinion the other judges concurred.